IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KEITH KIRKSEY, | | |
| Plaintiff, | | **8:24CV268** |
| v. | | |
| ORIENTAL TRADING COMPANY INC., | | **MEMORANDUM AND ORDER** |
| Defendant. | | |

This matter is before the Court on cross-motions for summary judgment filed by plaintiff Keith Kirksey ("Kirksey") and defendant Oriental Trading Company Inc. ("OTC"). *See* Fed. R. Civ. P. 56(a); NECivR 56.1. Summary judgment is not "a disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is an "integral part" of federal civil procedure designed to prevent "unwarranted consumption" of resources at trial based on claims and defenses that lack a sufficient factual basis. *Id.*

To that end, Kirksey seeks partial summary judgment (Filing No. 74) on his claim that OTC is liable for harassment/hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*[1] OTC seeks summary judgment on all seven of Kirksey's claims (Filing No. 70). For the reasons stated below, Kirksey's motion is denied, and OTC's motion is granted.

I.    **BACKGROUND**[2]

OTC sells "party supplies, toys, novelties, school supplies, home décor, and seasonal goods." It has a warehouse in La Vista, Nebraska (the "warehouse"). Kirksey, an African American man, has worked in the warehouse as a floor specialist since 2017.

---

[1]Kirksey repeatedly refers to that claim in his motion and brief as "Count IV." In his complaint, the Title VII "harassment/hostile work environment" claim seems to be "Count Five."

[2]The facts are primarily drawn from the parties' respective statements of fact.

He reports to Kevin Christiansen, OTC's Facilities and Housekeeping Supervisor. By all accounts, he has performed well at OTC.

For most of his time at OTC, he has worked the overnight shift—9:00 p.m. to 5:30 a.m. When OTC eliminated the overnight shift for all employees, Kirksey "began working a swing shift from 3:00 p.m. until 11:30 p.m." The change did not affect his rate of pay, his total hours, or his wages.

On or about June 18, 2020, an OTC employee placed a miniaturized string "noose on the seat of the floor machine" Kirksey used at work. Kirksey "was distraught, visibly shaken, upset, and scared upon finding the" noose, especially because his father told him Kirksey's uncle had been "hung from a tree with a noose because he was black."

Kirksey promptly reported the incident to security and Steve Samek ("Samek"), OTC's Director of Facility Management. OTC's security team took photographs and tried to preserve evidence for law enforcement. "Samek immediately left his home and drove to the" warehouse to meet with Kirksey. He expressed support, apologized for the incident, sent Kirksey home that day, and granted him paid leave from June 18, 2020, to July 6, 2020.

In the meantime, OTC investigated the incident to identify the perpetrator. When it found him, it fired him. It was one of Kirksey's coworkers, Bruce A. Quinn ("Quinn"). It was the first time OTC received a race-based harassment complaint about Quinn.

OTC shared the results of its investigation with law enforcement. Quinn eventually pleaded guilty to a hate crime under 18 U.S.C. § 245(b)(2)(C). As part of his plea, he admitted he intended to threaten and intimidate Kirksey and interfere with his employment. He "was sentenced to four months in federal prison."

Since that incident, Kirksey has had lingering problems with depression, anxiety, and stress. He "copes with fear and anxiety every time he goes to work at OTC." OTC

has offered him counseling "through its employee assistance program." He continues to receive treatment. He states he "is not moving for summary judgment regarding the" noose, but that "OTC's knowledge and actions . . . are relevant" to a later incident.[3]

On October 22, 2022, near the end of his overnight shift at 5:30 a.m., Kirksey noticed a scary clown mask with a rope around its neck on an order-picker machine in the warehouse. No one else was around, and the warehouse was very dark. Kirksey does not use the machine, but he walks by it "during his normal work routine." Kirksey describes the mask as a "Severed Head With Noose."[4]

Kirksey immediately reported the mask to security and his supervisor, who contacted him that morning. OTC obtained a statement from Kirksey, photographed the mask and rope, and upon review, confirmed they were part of a returned OTC Halloween product. The mask and rope had been separated from the body of the product.

Further investigation revealed that another warehouse employee, Randy Kelsey ("Kelsey"), put "the mask on the order picker, as part of a longstanding practice of warehouse employees staging damaged or returned inventory throughout the warehouse," especially at Halloween. Kirksey is not familiar with such shenanigans. Before Kelsey moved the mask to the order picker, it had been placed in other parts of the warehouse. He moved it to a "high-traffic area near an employee time clock and an entry/exit point, right next to a marked walkway that many employees would use."

---

[3]At the same time, in his brief opposing summary judgment (Filing No. 102), Kirksey argues "[t]he continuing violation theory applies to the First Noose Incident." *See West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995).

[4]OTC disputes the characterization of the rope as a noose, explaining "[t]he clown mask and the attached rope were part of a Halloween product OTC sold. The rope connects the clown mask to the body of the clown, much like a scarecrow." In the end, the disagreement makes little difference. While technically perhaps not a noose, the rope on the scary Halloween mask is indubitably intended to be menacing.

3

Kirksey and Kelsey do not know each other and have neither met nor ever interacted with each other.  Given that, and the rest of the circumstances, OTC concluded Kelsey's "staging of the clown mask was not targeted at or intended for [Kirksey] and was not an act of harassment."  Though OTC could have disciplined Kelsey under its employee handbook and policies even without a nefarious motive, it didn't, determining his placement of the mask "was part of an ongoing warehouse prank" and "only a joke."

All of the OTC employees who investigated the mask and rope were white.  OTC never told Kirksey who put the mask on the order picker or why.  No one ever asked Kirksey (or any other black person) whether "he was offended, upset, or felt harassed, or discriminated against by the" placement of the mask and rope.  He was and did, particularly because of the hatred, harassment, racism, intimidation, and discrimination a noose represents.  His prior experience with a noose exacerbated his fear, pain, anxiety, depression, and stress.  Kirksey's supervisor noticed the change in his demeanor.

On October 25, 2022, some of Kirksey's coworkers reported "that he was telling other employees that he was carrying a gun at work."  When OTC's Director of Security met with Kirksey and asked him about it, he vehemently denied it.  OTC visually inspected Kirksey's car but took things no further.  They told Kirksey they believed him, and he suffered no disciplinary action.

Since October 22, 2022, Kirksey has "repeatedly expressed [his] concerns to OTC" and others "that OTC was out to get [him] on account of [his] race and retaliating against" him.  But he has not experienced anything similar to the June 2020 noose incident or the October 2022 mask incident.

On or about June 1, 2023, OTC asked Kirksey to sign a "Motor Vehicle Record Disclosure and Change in Driving Record."  Kirksey signed a similar form when he started with OTC in 2017.  When Kirksey and his counsel questioned whether OTC requested the form for improper purposes, OTC advised them that it had updated the form and asked

4

Kirksey and dozens of other employees with driving in their job descriptions to fill out the updated form. OTC provided additional information about what it sees as a routine request during discovery. Despite that, Kirksey maintains he is "not aware of anyone else in [his] department being directed to sign" the "form in or around June 2023." He still questions whether being asked to sign the updated form was discriminatory or retaliatory.

On October 20, 2023, Kirksey had a disagreement with Jim Homan ("Homan"), a member of OTC's maintenance staff, "about Kirksey's use of a golf cart in the warehouse." Homan asked why Kirksey was using the golf cart, and when he didn't respond, "began yelling at [him] through a two-way radio." Homan also told Kirksey he "was driving the golf cart the wrong direction" and demanded its return. "At no point during the exchange did Homan use any racially charged language toward" Kirksey.

Kirksey reported the incident to OTC, explaining that he thought "Homan's conduct was racially motivated." He thought Homan and Quinn were friends and that Homan harbored ill-will due to Quinn's termination and prosecution. Kirksey further believed Homan was somehow involved in the noose incident.

OTC investigated the golf-cart incident involving Homan and gave him "a final written warning for his unprofessional altercation with" Kirksey. He was terminated in January 2024 after another unprofessional altercation with a different coworker. Kirksey is still an OTC employee.

On May 26, 2023, Kirksey filed a discrimination charge with the Nebraska Equal Employment Opportunity Commission and the United States Equal Opportunity Commission. He amended his charge later that year and filed suit on July 2, 2024 (Filing No. 1) after receiving a right-to-sue letter. Kirksey alleges race discrimination, retaliation, and harassment/hostile work environment, in violation of Title VII and the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. § 8-1101 *et seq.* He also alleges negligent infliction of emotional distress.

On May 27, 2025, OTC moved for judgment on the pleadings (Filing No. 32), arguing the Court should judicially estop Kirksey from pursuing his claims because he failed to disclose them in prior bankruptcy proceedings. The Court denied the motion without prejudice to OTC moving for summary judgment on that basis (Filing No. 57), which it does.

At the close of discovery, OTC moved to exclude (Filing No. 76) certain testimony from Kirksey's expert witness, Jerry Authier, Ph.D. Kirksey in turn moved to exclude (Filing No. 81) "the report, testimony, and opinions of Timothy D. Loudon" ("Loudon"), OTC's proposed expert on human resources and workplace investigations. The magistrate judge denied OTC's motion but granted Kirksey's, concluding that "[a]llowing Loudon to testify as an expert to the 'adequacy' and 'reasonableness' of OTC's investigation would invade the province of the jury" (Filing No. 109).

OTC objected (Filing No. 110) to the magistrate judge's order. It contends her "ruling was clearly erroneous and contrary to law, and . . . should be set aside accordingly." *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a). In particular, OTC objects to any prohibition on Loudon "testifying about the adequacy and reasonableness of [OTC's] investigations and remedial measures." Alternatively, OTC asserts that the scope of the magistrate judge's wholesale restrictions are too broad. In its view, Loudon should—at minimum—"be permitted to testify regarding applicable industry standards and whether OTC's investigations and responses comported with those standards."

Unsurprisingly, Kirksey sees the magistrate judge's ruling in a far more-favorable light. He glowingly opines her decision "employed sound reasoning, was amply supported by relevant case precedent, articulately analyzed and applied the facts to the law, and reached the correct conclusion."

The Court need not resolve this dispute. In these circumstances, the Court's determination that OTC is entitled to summary judgment on all of Kirksey's claims makes

it unnecessary to decide whether Loudon's proposed expert testimony was indeed beyond the scope of his report and would have categorically invaded the province of the jury had this case gone to trial.

The Court now turns to that summary-judgment analysis. Kirksey seeks partial summary judgment on OTC's liability for harassment/hostile work environment under Title VII. OTC primarily challenges Kirksey's claims on the merits but also briefly renews its estoppel argument.

## II.   DISCUSSION

### A.   Standard of Review

On cross-motions for summary judgment, the Court views "the evidence in the light most favorable to the nonmoving party and" gives them "the benefit of all reasonable inferences." *Sioux Steel Co. v. Ins. Co. of State of Pa.*, 127 F.4th 1113, 1117 (8th Cir. 2025) (quoting *Dallas v. Am. Gen. Life & Accident Ins. Co.*, 709 F.3d 734, 736 (8th Cir. 2013)). But the Court will neither speculate, *see Redlich v. City of St. Louis*, 51 F.4th 283, 286 (8th Cir. 2022), nor "credit mere allegations, unsupported by specific facts or evidence," *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 598 (8th Cir. 2020) (quoting *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 807 (8th Cir. 2020)).

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue for trial exists when 'a reasonable jury could return a verdict for the nonmoving party.'" *Melton v. City of Forrest City*, 147 F.4th 896, 901 (8th Cir. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party "'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original)

7

(quoting *Celotex*, 477 U.S. at 323).  It "can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial."  *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018).

If the moving party meets its burden, the nonmoving party "may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial."  *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032 (8th Cir. 2016). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### B.    Harassment/Hostile Work Environment[5]

Both parties seek summary judgment on Kirksey's harassment/hostile work environment claims.  "To establish a claim of a racially hostile work environment," Kirksey "must show that he was subjected to unwelcome harassment because of his race and that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment."  *Woods v. Collins*, 150 F.4th 967, 973 (8th Cir. 2025).  The standard includes both subjective and objective components. *See Warren v. Nucor Corp.*, 150 F.4th 990, 998 (8th Cir. 2025).  That is, Kirksey must subjectively believe the alleged harassment was abusive—which he states he does—and

---

[5]Kirksey brings claims under both Title VII and NFEPA.  Because NFEPA is modeled on its federal counterpart, courts and parties often analyze such claims together. *See Perry v. Zoetis, LLC*, 8 F.4th 677, 680 (8th Cir. 2021) (citing *Hartley v. Metro. Utils. Dist. of Omaha*, 885 N.W.2d 675, 692 (2016)).  This Court follows that practice.  The Court also agrees with OTC that Kirksey's separate claims of race-discrimination and harassment/hostile work environment rest on the same foundation and can be analyzed together.  Kirksey does not say otherwise.

the alleged harassment must be "objectively hostile as perceived by a reasonable person." *See id.* (quoting *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010)).

Proving such a claim is not easy. *See Yelder v. Hegseth*, 151 F.4th 943, 956 (8th Cir. 2025). "To satisfy the objective prong of the inquiry, the conduct 'must be more than merely offensive, immature or unprofessional; it must be extreme.'" *See id.* (quoting *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005)). In evaluating whether Kirksey can show he suffered harassment that "created a hostile work environment," the Court considers "the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with [his] work performance." *Beran v. VSL N. Platte Ct. LLC*, 144 F.4th 1007, 1012 (8th Cir. 2025) (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010)). Kirksey's workplace at OTC "must be 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Warren*, 150 F.4th at 999 (quoting *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005)).

Kirksey does not meet this "'demanding' standard." *Id.* (quoting *Anderson*, 606 F.3d at 518). One problem is that Kirksey has not—under the totality of the circumstances in this case—adduced sufficient evidence that he was subjected to actionable harassment or a hostile work environment at OTC based on his race. *See Woods*, 150 F.4th at 973 (rejecting a hostile-work-environment claim where the plaintiff "offer[ed] little more than speculation and conjecture that the incidents had anything to do with race"); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").

Beyond the lack of a causal nexus, he also fails to establish the requisite frequency, severity, pervasiveness, and objective hostility. *See Parker v. USDA*, 129 F.4th 1104, 1113-14 (8th Cir. 2025) (concluding the defendant's "hostile work environment claims fail[ed] because she [did] not establish that the harassment (1) was based on her membership in a protected class; (2) was severe or pervasive; and (3) affected a term or condition of her employment"); *Woods*, 150 F.4th at 973 (concluding that the plaintiff's allegations, including instances of the plaintiff's supervisors "yelling at or disrespecting [him] and other black employees," "taken individually or collectively, were not so severe or pervasive as to 'alter the conditions of [his] employment and create an abusive working environment'" (quoting *Martinez-Medina v. Rollins*, 144 F.4th 1091, 1096 (8th Cir. 2025))). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Yelder*, 151 F.4th at 956 (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016)).

Kirksey tries in vain to bridge the gap by reaching back to June 2020 to tie the Halloween mask and his unrelated interaction with Homan to a fired employee's avowedly racist placement of a noose on Kirksey's seat. But he does not provide sufficient evidence to reasonably establish a link between those isolated events in these circumstances, let alone to show that OTC is liable under the governing law. *See Parker*, 129 F.4th at 1113; *Warren*, 150 F.4th at 1000 ("To establish a hostile work environment claim based on the actions of his coworker, [the plaintiff] must present evidence that [the defendant] 'knew or should have known about the harassment and failed to respond in a prompt and effective manner.'" (quoting *Anderson*, 606 F.3d at 519)); *accord Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.").

Kirksey's assertion that he "is entitled to summary judgment" solely based on the fact that OTC determined the placement of the returned Halloween mask in the warehouse was a prank or joke despite policies prohibiting such activities in the Employee Handbook

10

is unavailing. OTC's policies and practices—whether ironclad or aspirational—do not "conclusively" redefine state and federal law on hostile work environment. And Kirksey's subjective views are a key component of the analysis, but they are not dispositive as he suggests—regardless of any purported OTC "zero-tolerance" policy to the contrary.

The Court is also not persuaded by his brief argument that the continuing-violation doctrine applies here. *See Wilkie v. DHHS*, 638 F.3d 944, 951 (8th Cir. 2011) (explaining that discrete charges of discrimination and retaliation must be filed "within the appropriate time period . . . set forth in 42 U.S.C. § 2000e-5(e)(1)" but that hostile-work-environment claims will be timely if any act contributing to the claim falls within the filing period (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002))). Such acts must be "so similar in nature, frequency, and severity [that they] must be considered to be part and parcel of the hostile work environment . . . that gave rise to the action." *EEOC v. BNSF Ry.*, 150 F.4th 948, 963 (8th Cir. 2025) (alterations in original) (quoting *Wilkie*, 638 F.3d at 951). Kirksey has not made that showing here. *See Wilkie*, 638 F.3d at 951-52. And his assertion that "[t]he Severed Head With Noose was not an isolated event but part of a broader hostile work environment" created, permitted, "actively encouraged," and endorsed by OTC is belied by the record, particularly where OTC's prompt and proactive response to the noose resulted not only in OTC immediately firing the perpetrator but with him also serving prison time for his conduct. *See Warren*, 150 F.4th at 1000 (noting an employer's swift and effective termination of an offending employee barred liability for hostile work environment).

### C.    Retaliation

Kirksey's retaliation claims likewise fall short. "Title VII prohibits employers from, among other things, retaliating against employees for opposing unlawful employment practices, making a charge, or participating in an investigation under the statute." *Sherman v. Collins*, 158 F.4th 904, 909 (8th Cir. 2025) (quoting *Kempf v. Hennepin County*, 987 F.3d 1192, 1195 (8th Cir. 2021)); *see also* 42 U.S.C. § 2000e–3(a). To establish unlawful retaliation, Kirksey "must prove that '(1) he engaged in protected conduct, (2) he suffered

[an] adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Warren*, 150 F.4th at 997 (quoting *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011)); *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 353 (2024); *cf. Collins v. Union Pac. R.R.*, 108 F.4th 1049, 1053 (8th Cir. 2024). "Absent any materiality or significance requirements, '[a]n adverse employment action is a disadvantageous change to the compensation, terms, conditions, or privileges of employment.'" *Collins*, 108 F.4th at 1053 (alteration in original) (quoting *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024)).

In his complaint, Kirksey alleges OTC retaliated against him for reporting racial discrimination and his hostile work environment by adjusting his hours, interrogating him, making "baseless allegations against him, including that he was carrying a weapon," threatening him "with disciplinary action without basis, and attempt[ing] to force [him] to allow OTC access to his personal information and motor vehicle records." His brief focuses on OTC's purported coverup and "endorsement of the severed head with noose," false accusations of safety violations[6] and carrying a gun, and "[t]he timing and nature of OTC's demand that" he sign the vehicle form.

Again, Kirksey does not adequately support his allegations with admissible evidence. *See Sherman*, 158 F.4th at 909. Perhaps most importantly, he "hasn't provided sufficient evidence 'of a causal link between the protected conduct and'" an actionable adverse employment action. *Id.* (quoting *Kempf*, 987 F.3d at 1196). He "merely speculates that a causal relationship exists without demonstrating why a reasonable jury could agree." *Id.*

---

[6]OTC cogently challenges Kirksey's reliance on "new, discrete allegations of retaliation for the first time in his opposition brief" based on such alleged safety violations because he did not raise them at the administrative level. It also faults him for failing to provide any "substance regarding when the alleged safety violations occurred, whether he was disciplined, and the identity and knowledge of his prior complaints by anyone involved, leaving OTC with no real opportunity to respond to them."

For instance, even if signing the vehicle form qualifies as an adverse employment action in these circumstances, *see Woods*, 150 F.4th at 972 (explaining Title VII requires a plaintiff to "show 'some harm respecting an identifiable term or condition of employment,'" such as "a reduction in pay," transfer, or disciplinary action (quoting *Muldrow*, 601 U.S. at 354-55)); *Parker*, 129 F.4th at 1114, Kirksey provides no probative evidence to create a genuine dispute as to whether OTC singled him out to sign the vehicle form in retaliation for his reports of race discrimination by coworkers at OTC, *see Sherman*, 158 F.4th at 909. Mere suspicions and speculation are not enough. *See id.*

His allegations of retaliation based on OTC falsely accusing him of having a gun are just as weak. *See id.*; *Parker*, 129 F.4th at 1114 (affirming summary judgment where the defendant provided "no evidence of a causal nexus between her protected conduct and any alleged adverse action"). The undisputed evidence indicates that when Kirksey's coworkers raised serious concerns about his alleged comments, OTC briefly investigated and quickly believed his denial. Kirksey simply "hasn't pointed to specific evidence that would allow a reasonable jury to conclude that" OTC's response to its other employees' concerns constitutes an adverse employment action driven by "an unlawful motive." *Sherman*, 158 F.4th at 909; *see also Warren*, 150 F.4th at 998 (explaining any inference of retaliation dissipates over time, vanishing "altogether when the time gap between the protected activity and the adverse employment action is measured in months" (quoting *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011)).

OTC is entitled to summary judgment on Kirksey's retaliation claims.

### D.   Negligent Infliction of Emotional Distress

Kirksey's last claim is that OTC breached its "duty to protect [him] from injury and to provide a non-discriminatory and non-hostile work environment" by failing to "implement procedures and safeguards to protect its employees, including Kirksey, from discrimination, threats, and intimidation." He further alleges, "OTC breached its duty . . . by encouraging the placement of a severed clown head with a noose around its neck, failing

to take remedial action after the fact, and considering the racist symbolism to be a joke, especially after Kirksey was subjected to a direct hate crime involving a different noose and had an uncle hung by a tree with a noose."

To recover for negligent infliction of emotional distress under Nebraska law, Kirksey must show that OTC's negligent acts "proximately caused h[im] to suffer severe emotional distress." *Schleich v. Archbishop Bergan Mercy Hosp.*, 491 N.W.2d 307, 310 (Neb. 1992). "To be actionable, emotional distress must have been so severe that no reasonable person could have been expected to endure it." *Id.* In that vein, "the emotional anguish or mental harm must be medically diagnosable and must be of sufficient severity that it is medically significant." *Id.*; *Sell v. Mary Lanning Mem'l Hosp. Ass'n*, 498 N.W.2d 522, 525 (Neb. 1993).

Neither party has cited a Nebraska case addressing negligent infliction of emotional distress in an employment situation like this where the employer's proposed duty aligns very closely with apposite antidiscrimination statutes. The parties' arguments instead focus on the cause and degree of Kirksey's emotional distress.

Some courts view such tort claims narrowly "and apply a stricter approach" to emotional-distress claims arising from an employment relationship, particularly those based on allegations of outrageous conduct. *Cf. Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 478 (8th Cir. 2010). Other limitations may also apply. *See*, *e.g.*, *Johnson v. Midwest Div.-RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (concluding the plaintiff's common-law "claim for unlawful infliction of emotional distress" was preempted by the Missouri Human Rights Act ("MHRA") because the allegations of harassment and discrimination were "the same factual allegations underlying" her claims under the MHRA); *Bogan v. Gen. Motors Corp.*, 500 F.3d 828, 832 (8th Cir. 2007) (analyzing whether "the intentional infliction of emotional distress claim was preempted by § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185"); *Coats v. Kraft Heinz Foods Co.*, No. 2:21-CV-4159-MDH, 2021 WL 5889980, at *4-5 (W.D. Mo. Dec. 13,

14

2021) ("In cases in which plaintiffs have filed claims under Title VII and/or the MHRA as well as common law tort claims for intentional and/or negligent infliction of emotional distress, courts have consistently dismissed the common-law tort claims as being preempted by the Missouri Workers' Compensation Act."); *Radcliffe v. Securian Fin. Grp., Inc.*, 906 F. Supp. 2d 874, 894 (D. Minn. 2012) (deciding the plaintiff's common-law claims, including for intentional infliction of emotional distress, were preempted because her emotional and other injuries were related to the defendant's duty to protect her "from harassment, discrimination, and retaliation in the workplace and" fell within the protections of the Minnesota Human Rights Act, so her common-law claims were preempted); *Cole v. Wells Fargo Bank, N.A.*, 437 F. Supp. 2d 974, 985 (S.D. Iowa 2006) (concluding that given the overlap in her factual allegations, the plaintiff's specific "intentional infliction of mental distress claim [wa]s preempted by the" Iowa Civil Rights Act); *Skinner v. Ogallala Pub. Sch. Dist. No. 1*, 631 N.W.2d 510, 520 (Neb. 2001) (explaining that ordinarily "the Nebraska Workers' Compensation Act is an employee's exclusive remedy against an employer for an injury arising out of and in the course of employment"); *Jensen v. Champion Window of Omaha, LLC*, 900 N.W.2d 590, 594-95 (Neb. Ct. App. 2017) (contemplating the possibility of an employee having claims against his employer for alleged violations of Title VII and NFEPA and for negligent or intentional infliction of emotional distress based on the same underlying facts but concluding claim preclusion warranted dismissal of the emotional-distress claims).

Here, the primary obstacle for Kirksey is his failure to show any negligent act *by OTC* that proximately caused him to suffer emotional distress "so severe that no reasonable person could have been expected to endure it." *Schleich*, 491 N.W.2d at 310; *accord Sell*, 498 N.W.2d at 525 (explaining "a valid claim for negligent infliction of emotional distress" requires the plaintiff "'to show that a negligent act of the defendant's proximately caused h[im] to suffer severe emotional distress'" (quoting *Schleich*, 91 N.W.2d at 310)). As OTC points out, the Nebraska Supreme Court has "establishe[d] a high threshold of severity under this standard." *Hamilton v. Nestor*, 659 N.W.2d 321, 329 (2003).

15

Kirksey relies heavily on Quinn's placement of the miniaturized, string noose in 2020, but even if timely, Quinn's actions are not fairly attributable to OTC in these circumstances. OTC's own actions, including terminating Quinn, assisting in his criminal prosecution, and giving Kirksey support and leave from work do not give rise to an actionable emotional-distress claim. *See id.*; *Sell*, 498 N.W.2d at 525. As for the Halloween mask and rope, even if OTC made the wrong call by accepting Kelsey's non-discriminatory explanation, failed to take sufficient remedial measures, or otherwise breached a duty it owed to Kirksey, Kirksey has not adduced sufficient evidence to create a triable issue as to whether OTC's own actions proximately caused emotional distress so severe that no reasonable person could bear it. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Hamilton*, 659 N.W.2d at 329; *Schleich*, 91 N.W.2d at 310.

In light of the foregoing,

IT IS ORDERED:

1. Plaintiff Keith Kirksey's Motion for Partial Summary Judgment (Filing No. 74) is denied.

2. Defendant Oriental Trading Company Inc.'s Motion for Summary Judgment (Filing No. 70) is granted.

3. Its objections (Filing No. 110) to the magistrate judge's March 9, 2026, Memorandum and Order (Filing No. 109) are overruled as moot.

4. This case is dismissed with prejudice.

5. A separate judgment will issue.

Dated this 13th day of April 2026.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge

16